UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| PAUL KITCHEN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>Acting Commissioner of Social Security, )<br>)<br>Defendant. ) | No. 3:16-cv-00020<br>Judge Trauger<br>Magistrate Judge Brown |

To: The Honorable Aleta A. Trauger, United States District Judge

## REPORT AND RECOMMENDATION

The Plaintiff brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Commissioner's denial of his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. For the following reasons, the Magistrate Judge **RECOMMENDS** that the Plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision be **AFFIRMED**.

## I. PROCEDURAL HISTORY

In 2011, the Plaintiff applied for disability insurance benefits, alleging an onset date of March 1, 2011. (Doc. 10, pp. 79, 175).[1] His applications were denied on initial review and again upon reconsideration. (Doc. 10, pp. 79-80, 83, 90). Two administrative hearings were convened at the Plaintiff's request. (Doc. 10, pp. 25-78). The administrative law judge ("ALJ") issued an unfavorable decision (Doc. 10, pp. 7-24) which the Appeals Council declined to review (Doc. 10, pp. 1-3). Thereafter, the Plaintiff filed a complaint seeking review of the ALJ's decision. (Doc. 1). This case was referred to the undersigned pursuant to Rule 72 of the Federal Rules of

---

[1] References to the administrative record (Doc. 10) are to the Bates stamp at the lower right corner of each page.

1

Civil Procedure and 28 U.S.C. § 636(b)(1)(A)-(B). (Doc. 3). Pending now is the Plaintiff's motion for judgment on the administration record (Doc. 14) to which the Defendant responded (Doc. 16) and the Plaintiff replied (Doc. 17).

## II. REVIEW OF THE RECORD

### A. Medical Evidence[2]

#### 1. Premier Orthopaedics & Sports Medicine, PLC, July 1999 through March 2005

The Plaintiff presented to Premier Orthopaedics & Sports Medicine, PLC from July 1999 to March 2005. (Doc. 10, pp. 790-839). He underwent a rotator cuff surgery on his left shoulder in 2000 and was treated for right shoulder pain, left wrist pain, and left shoulder pain residual from repeat rotator cuff repair. (Doc. 10, pp. 790-839).

#### 2. Affiliated Internists, February 2008 through May 2013

From 2008 to 2010, Dr. Travis Pardue, M.D., treated the Plaintiff for major depressive disorder, severe degenerative disc disease, lumbago of the lumbar and cervical spine, post-laminectomy syndrome, paraspinal muscle pain and tenderness, finger pain, inflammatory arthritis, joint pain, cervical spondylosis and radiculopathy, cervicalgia, and lumbar radiculopathy. (Doc. 10, pp. 332-523). Assessments of the Plaintiff during these visits generally showed normal muscular findings with a normal gait and station, normal neurological findings, and normal psychological findings. (Doc. 10, pp. 356-523). An MRI of the Plaintiff's cervical spine on March 10, 2010 revealed mild spinal stenosis on several levels, most pronounced at C3-C4, and foraminal stenosis at several levels, worse on the left at C6-C7. (Doc. 10, p. 586).

The Plaintiff saw Dr. Pardue approximately once a month from 2011 to 2013. He generally denied depression. (Doc. 10, pp. 540, 542, 549, 553, 633, 635, 638, 644, 654, 664, 673,

---

[2] The records pertinent to the Plaintiff's claims of error are discussed herein, and the remainder of the administrative record is incorporated by reference. With respect to Exhibit 15F, Doc. 10, pp. 973-998, the Court cannot consider these records because they were not submitted to the ALJ.

682, 687, 701). Exam notes continued the trend of normal muscular findings with a normal gait and station, normal neurological findings, and normal psychological findings. (Doc. 10, pp. 533, 539, 542-543, 545-547, 550, 551-554, 634-636, 638-640, 642, 644, 652, 654, 656, 658, 660, 662, 664, 682, 685, 698). When assessed, the Plaintiff had full strength and normal bulk and tone in his right upper extremity, left upper extremity, right lower extremity, and left lower extremity. (Doc. 10, pp. 542-543, 551-554, 635-636, 698). On occasion, the Plaintiff presented with disturbed gait or station, spine deformity or tenderness, or decreased extension, flexion, lateral bending, and rotation. (Doc. 10, pp. 525, 541, 552, 634, 640, 660, 664, 698, 701, 703).

The Plaintiff repeatedly reported that his medications effectively controlled his pain, produced no side effects, and permitted him to function better and perform activities of daily living. (Doc. 10, pp. 639, 641, 643, 653, 659, 661, 663, 665). On one occasion, the Plaintiff reported a new medication made him groggy and thereafter switched to his original medication. (Doc. 10, p. 653).

A January 2013 cardiopulmonary exercise test indicated that the Plaintiff could sustain light activity, such as desk work, constantly during the day, and could perform various jobs, like bartending or driving a heavy truck, in an eight-hour workday. (Doc. 10, p. 690). The reviewer noted that the Plaintiff ended the test early because of complaints of back pain and fatigue and recommended the Plaintiff be placed in an exercise program. (Doc. 10, p. 689).

   3. **Pinnacle Wellness Group, July 2013 through July 2014**

From July 2013 to July 2014, the Plaintiff attended Pinnacle Wellness Group on a monthly basis for chronic pain management after trying previous treatments, including a back brace, facet and epidural injections, medications, surgery, physical therapy, and a TENS unit. (Doc. 10, pp. 709-785, 840-972). He was treated by a board certified family nurse practitioner.

Treatment records show reports of knee, neck, and back pain on a scale of 5 to 8 out of 10; normal gait, neurological findings, and psychological findings; tender spine, facet joints, and sacroiliac joints; decreased rotation; abnormal Schober's test; and positive straight leg raise. (Doc. 10, pp. 709- 716, 719-726, 729-736, 739-745, 748-755, 758-774, 776-780, 840-920).

Routine drug testing showed the presence of medication that was not prescribed, including: Butalbital, Nordiazepam, Oxazepam, Temazepam, Fentanyl, and Norfentanyl. (Doc. 10, pp. 717-718, 727-728, 737-738, 746-747, 756-757).

**B. Opinion Evidence**

**1. Reports from the Plaintiff and His Wife**

The Plaintiff alleged disability on account of degenerative disc disease, major depression, lumbar spinal stenosis, rheumatoid arthritis, and poor vision. (Doc. 10, p. 201). He takes care of a pet with help, must get up every thirty minutes which disrupts his sleep, prepares light meals two times a week, can fold laundry and dust in short periods with encouragement, goes outside five times a week, can ride in a car but cannot drive, can go out alone, has no trouble handling money, watches television and listens to online radio shows every day, talks on the phone for a limited time, and needs accompaniment for social activities. (Doc. 10, pp. 220-223). He indicated that his conditions affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, concentrate, and follow instructions. (Doc. 10, p. 224). He stated he can walk 100 yards before needing to stop and rest for thirty minutes, can only pay attention for thirty minutes, follows instructions relatively well, gets along with authority figures, and does not handle changes in routine well. (Doc. 10, pp. 224-225). He uses prescription glasses, a cane, and a brace or splint while outside his home. (Doc. 10, p. 225).

In July 2011, he claimed his back was more painful, he was more depressed, and his medication caused blurry vision and difficulty focusing. (Doc. 10, pp. 212-213). In December 2011, he stated that he can only stand twenty minutes, walk twenty minutes at a time, and stay on his feet no more than one hour per day. (Doc. 10, p. 234).

The Plaintiff's wife also filled out a function report in December 2011. (Doc. 10, pp. 236-243). The report is generally consistent with the Plaintiff's except his wife stated he makes light meals weekly, only leaves the house once per month, cannot handle most monetary functions, has trouble seeing, with memory, completing tasks, and understanding, has trouble getting along with authority figures, and does not use a brace or splint. (Doc. 10, pp. 238-239, 241-242).

### 2. Medical Source Statements from Dr. Pardue

Dr. Pardue, an internal medicine specialist, filled out a medical source statement for the Plaintiff in May 2011. (Doc. 10, pp. 284-293). He opined that the Plaintiff can occasionally lift and carry up to 10 pounds due to lumbar back pain. (Doc. 10, p. 284). Because of the Plaintiff's multiple lumbar back surgeries, he can sit 30 minutes at a time, stand 15 minutes at a time, and walk fifteen minutes at a time; sit two hours in an eight hour day, stand 15 minutes in an eight hour day, and walk 15 minutes in an eight hour day; must use a cane to ambulate more than 100 yards; and can carry small objects with his hands when not using a cane. (Doc. 10, p. 285). He can only occasionally use his hands because of cervical degenerative disc disease and only occasionally use his feet because of osteoarthritis. (Doc. 10, p. 286). He can never climb ladders, balance, or crawl, and can occasionally climb stairs, stoop, kneel, and crouch. (Doc. 10, p. 287). The Plaintiff can never tolerate unprotected heights or moving mechanical parts and occasionally tolerate other environmental limitations. (Doc. 10, p. 288). The noise level should be akin to a library. (Doc. 10, p. 288). The Plaintiff cannot shop, travel without a companion, walk a block at

a reasonable pace on rough or uneven surfaces, climb a few steps at a reasonable pace with the use of a single hand rail, or prepare simple meal and feed himself. (Doc. 10, p. 289). He can ambulate without using a wheelchair, walker, two canes, or two crutches; use standard public transportation, care for personal hygiene, and sort, handle, and use paper files. (Doc. 10, p. 289). Due to medication, the Plaintiff is markedly impaired in his ability to make judgments on complex work-related decisions, mildly impaired in his ability to understand and remember complex instructions, and moderately impaired in other memory and social interaction functions. (Doc. 10, pp. 291-292). According to Dr. Pardue, the Plaintiff has suffered from these physical and mental limitations since 1995. (Doc. 10, pp. 289, 292).

Dr. Pardue completed a second medical source statement on January 7, 2014. (Doc. 10, pp. 705-708). He opined the Plaintiff can occasionally and frequently lift and carry less than ten pounds, stand or walk for less than two hours in an eight-hour workday, sit less than six hours in an eight hour workday, and has a limited ability to push and pull with upper and lower extremities. (Doc. 10, pp. 705-706). These opinions were supported by the Plaintiff's severe lumbar back pain, severe lumbar tenderness, positive straight leg raise, multiple lumbar surgeries, and MRI results. (Doc. 10, p. 706). He opined the Plaintiff can never climb stairs or stoop and can only occasionally balance, kneel, crouch, or crawl due to his severe lumbar back pain "that limits him from doing anything." (Doc. 10, p. 706). Due to cervical spinal stenosis, foraminal stenosis, and osteoarthritis in his hand, the Plaintiff can constantly feel, but only occasionally reach, handle, and finger objects. (Doc. 10, p. 707). Dr. Pardue identified no visual, communicative, or environmental limitations. (Doc. 10, pp. 707-708).

### 3. Reports from State Examiners

Dr. Horace Edwards, Ph.D., completed a psychiatric review technique and mental residual functional capacity ("RFC") assessment in September 2011. (Doc. 10, pp. 299-316). He found mild restriction in activities of daily living, moderate difficulty maintaining social functioning and maintaining concentration, persistence, and pace, and no episodes of decompensation. (Doc. 10, p. 309). Giving controlling weight to Dr. Pardue's opinion, Dr. Edwards concluded that the Plaintiff can understand and remember simple, detailed, and multi-step detailed tasks, but not at an executive level; concentrate and persist for simple, detailed, and multi-step detailed tasks without significant difficulty with appropriate breaks; interact appropriately with the public, co-workers, and supervisors with these restrictions but would work better with things than with people; and can adapt to infrequent change and set limited goals. (Doc. 10, p. 311, 313-314) (Doc. 12-1, p. 315).[3]

In September 2011, Dr. Anita Johnson, M.D., completed a physical RFC assessment for the Plaintiff. (Doc. 10, pp. 317-326). Dr. Johnson opined the Plaintiff can occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand, sit, or walk for six hours in an eight-hour workday, and push and pull without additional limits. (Doc. 10, p. 318). The Plaintiff can frequently perform postural activities, has no manipulative, visual, or communicative limitations, and has no environmental restrictions aside from avoiding concentrated exposure to hazards. (Doc. 10, pp. 319-321). Dr. Johnson found that Dr. Pardue's medical source statement from May 2011 was too restrictive based on the normal neurological findings and normal gait in addition to no evidence that the Plaintiff used a cane. (Doc. 10, p. 323). Additionally, there were no medical records from a rheumatoid arthritis physician. (Doc. 10, p. 324).

---

[3] Page 315 was inadvertently omitted from the administrative record. (Doc. 12).

In response to the Plaintiff's allegations of worsening symptoms in January 2012, Dr. Reeta Misra, M.D., reviewed the Plaintiff's medical records and adopted Dr. Johnson's assessment. (Doc. 10, p. 327). Dr. Misra found the Plaintiff partially credible because the symptoms alleged were inconsistent with his good range of motion, normal strength, normal gait, and absence of neurological deficits. (Doc. 10, p. 327).

Also in January 2012, Dr. Robert de la Torre, Psy.D., adopted Dr. Edwards' mental health findings. (Doc. 10, p. 329). This assessment was based on Dr. Pardue's records, the Plaintiff's alleged symptoms, the Plaintiff's reported daily activities, and the remainder of the record. (Doc. 10, p. 329).

**C. The Administrative Hearing**

In a 2014 hearing, the Plaintiff testified that he previously underwent back surgery and three shoulder surgeries, the most recent of which was seven years prior. (Doc. 10, p. 59). Even with medication, he rated his pain a 6 out of 10. (Doc. 10, p. 57). No activities relieve his pain other than lying down, moving to find a comfortable position, and using a heating pad. (Doc. 10, p. 66). He last worked in 2011. (Doc. 10, p. 51). During the day, he listens to old time radio suspense theater shows on his laptop and plays solitaire. (Doc. 10, p. 67). He has a microwave and refrigerator in his bedroom so he can prepare meals during the day. (Doc. 10, pp. 57, 70).

The Plaintiff testified to significant physical restrictions: he cannot walk without a walker or cane; he can stand in place for up to five minutes if he has a cane or walker; he uses a cane and walker at home; he can sit for thirty minutes at a time; he is in bed most of the day; he does minimal exercises with ropes attached to his bed; he often becomes dizzy and blacked out once in 2011; his muscles are weak and pain radiates from his back to his hips and thighs; he

experiences migraines; and his grip strength is limited by shoulder surgeries and arthritis in his right hand. (Doc. 10, pp. 57, 60-61, 63-71).

The Plaintiff alleged side effects from his medication which included: memory loss, fatigue, and blurry vision. (Doc. 10, pp. 51, 57, 59, 66-67). He stated that his anti-depressive medication helped a little bit. (Doc. 10, pp. 71-72).

The vocational expert completed vocational interrogatories and responded to follow-up questions and hypotheticals presented by the ALJ and the Plaintiff's representative. (Doc. 10, pp. 30-34, 39-40, 258-261). An individual with the Plaintiff's RFC could not perform the Plaintiff's past relevant work. (Doc. 10, pp. 258-259). The hypothetical individual could, however, work as a dining room attendant, hand packager, or meat clerk. (Doc. 10, p. 260). He could not perform these jobs if he needed additional unscheduled breaks up to 30 minutes each day or needed a cane to stand. (Doc. 10, pp. 39-40).

**D. The ALJ's Findings**

The ALJ made the following findings of fact and conclusions of law:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

(2) The claimant has not engaged in substantial gainful activity since March 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

(3) The claimant has the following severe impairments: degenerative disc disease and major depressive disorder (20 CFR 404.1520(c)).

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(5) After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) except with no more than frequent postural activities of climbing, stooping, balancing, kneeling, crouching, and crawling; must avoid concentrated exposure to hazards; has the ability to understand, remember,

9

and carry out simple, detailed, and multi-step detailed, but no complex and not executive level tasks; can maintain concentration and attention for such tasks with normal breaks spread throughout the day; can interact appropriately with others; and can adapt to occasional changes in the workplace and job duties.

(6) The claimant is unable to perform any past relevant work (20 CFR 404.1565).

(7) The claimant was . . . 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

(8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2011, through the date of this decision (20 CFR 404.1520(g)).

(Doc. 10, pp. 12-19) (emphasis omitted).

### III. LEGAL STANDARDS

**A. Standard of Review**

Review of the Commissioner's disability decision is narrowly limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the right legal standards in reaching the decision. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence requires 'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016)

(quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). The presence of evidence favorable to the claimant does not warrant reversal if the Commissioner's decision was within the "zone of choice" supported by the evidence. *Buxton*, 246 F.3d at 772-73 (citations omitted).

## B. Administrative Proceedings

The Commissioner applies a five-step inquiry to determine whether an individual is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a). First, the claimant is not disabled if he is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). Second, the claimant is not disabled if he does not have a severe medically determinable impairment that meets duration requirements. *Id.* § 404.1520(a)(4)(ii). Third, the claimant is presumed disabled if he suffers from a listed impairment, or its equivalent, for the proper duration. *Id.* § 404.1520(a)(4)(iii). Fourth, the claimant is not disabled if based on his RFC he can perform past relevant work. *Id.* § 404.1520(a)(4)(iv). Fifth, the claimant is not disabled if he can perform other work based on his RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v). The burden of proof rests on the claimant from step one through step four, and the burden shifts to the Commissioner at step five. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)).

## IV. ANALYSIS

The Plaintiff's claims of error present two issues: (1) whether the ALJ violated the treating physician rule by giving little weight to Dr. Pardue's opinion evidence; and (2) whether the ALJ properly discounted the Plaintiff's credibility. (Doc. 15).

### A. The Treating Physician Rule

Dr. Pardue, the Plaintiff's treating physician, completed two medical source statements. (Doc. 10, pp. 284-293, 705-708). The ALJ gave these statements little weight. (Doc. 10, p. 17). The Plaintiff contends the ALJ should have given controlling weight to Dr. Pardue's opinion evidence and erred by giving great weight to the state examiners' opinions. (Doc. 15, pp. 10-14).

Opinions provided by treating sources are owed controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). When less than controlling weight is given to a treating source's opinion, the weight owed is arrived at by considering several factors: the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; whether the opinion is supported by medical evidence; whether the opinion is consistent with the record as a whole; the source's specialization; and any other relevant factors. *Id.* § 404.1527(c). The ALJ must provide "good reasons" for the weight afforded a treating source's opinion. *Id.* § 404.1527(c)(2). The "good reasons" given must be supported by evidence in the record and "be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996).

Substantial evidence supports the ALJ's conclusion that controlling weight was not owed to Dr. Pardue's opinions because the limitations therein were not supported by his own treatment notes or by the medical records produced by the Plaintiff's pain management provider. (Doc. 10, p. 17). Review of the record confirms this conclusion.

Dr. Pardue alleged severe functional limitations: the Plaintiff could lift and carry less than ten pounds, sit less than two hours in an eight-hour day, stand for fifteen minutes in an eight-hour day, and walk for fifteen minutes in an eight-hour day. (Doc. 10, pp. 284-285, 705-706). Though the Plaintiff last worked in 2011, Dr. Pardue opined the Plaintiff suffered from these severe limitations since 1995. (Doc. 10, pp. 51, 289, 292).

In stark contrast to the significant limitations suggested by Dr. Pardue, the medical records document minimal functional restrictions. Though the Plaintiff suffered from depression and a number of spinal and cervical complaints, as documented by an MRI of the cervical spine (Doc. 10, p. 586), Dr. Pardue's treatment notes regularly found normal muscular findings with a normal gait and station, normal neurological findings, and normal psychological findings. (Doc. 10, pp. 356-523, 533, 539, 542-543, 545-547, 550, 551-554, 634-636, 638-640, 642, 644, 652, 654, 656, 658, 660, 662, 664, 682, 685, 698). The Plaintiff had full strength and normal bulk and tone in his right upper extremity, left upper extremity, right lower extremity, and left lower extremity. (Doc. 10, pp. 542-543, 551-554, 635-636, 698). Instances of a disturbed gait or station, spinal tenderness, or decreased range of motion were relatively few. (Doc. 10, pp. 525, 541, 552, 634, 640, 660, 664, 698, 701, 703). A cardiopulmonary exercise test indicated the Plaintiff could perform a range of work in an eight-hour day. (Doc. 10, p. 690). Added to this, the Plaintiff made numerous reports that his medications effectively controlled his pain, produced no side effects, and permitted him to function and perform activities of daily living. (Doc. 10, pp. 639, 641, 643, 653, 659, 661, 663, 665). Records from the Plaintiff's pain management provider showed normal gait, neurological findings, and psychological findings; tender spine, facet joints, and sacroiliac joints; decreased rotation; abnormal Schober's test; and

positive straight leg raise. (Doc. 10, pp. 709- 716, 719-726, 729-736, 739-745, 748-755, 758-774, 776-780, 840-920).

Only having Dr. Pardue's first medical source statement to review, state examiner Dr. Johnson drew the same conclusions as the ALJ: Dr. Pardue's opinion was too restrictive based on the normal neurological findings, normal gait, and lack of evidence that the Plaintiff used a cane. (Doc. 10, p. 323). Reviewing examiner, Dr. Misra agreed with Dr. Johnson, citing the Plaintiff's good range of motion, normal strength, normal gait, and absence of neurological deficits. (Doc. 10, p. 327).

Dr. Pardue provided inconsistent postural limitations. He once opined that the Plaintiff could never climb ladders, balance, or crawl, and could occasionally climb stairs, stoop, kneel, and crouch. (Doc. 10, p. 287). He later stated that the Plaintiff could never climb stairs or stoop, and could occasionally balance, kneel, crouch, or crawl. (Doc. 10, p. 706). *See* SSR 96-2p, 1996 WL 374188, at *3 (explaining that a medical opinion is inconsistent "when two medical sources provide inconsistent medical opinions about the same issue").

Dr. Pardue provided contradictory environmental and auditory limitations. He first stated the Plaintiff could never tolerate unprotected heights or moving mechanical parts, occasionally tolerate other environmental limitations, and should be presented with a library-appropriate noise level. (Doc. 10, p. 288). He later opined that the Plaintiff had no environmental or auditory limitations. (Doc. 10, pp. 707-708). *See* SSR 96-2p, 1996 WL 374188, at *3.

Though no walking assistance device was prescribed or discussed in treatment notes, Dr. Pardue opined that use of a cane to ambulate more than 100 yards was a medical necessity. (Doc. 10, p. 285).

In contrast with the Plaintiff's testimony that he makes his own food during the day, Dr. Pardue stated the Plaintiff could not prepare a simple meal and feed himself. (Doc. 10, pp. 57, 70, 221, 289). Also in contrast with the Plaintiff's statement that he can leave the house on his own, Dr. Pardue opined the Plaintiff needed a travel companion. (Doc. 10, pp. 222, 289).

Though Dr. Pardue repeatedly noted that medication effectively controlled the Plaintiff's pain, produced no side effects, and permitted the Plaintiff to function better and perform activities of daily living, he opined the Plaintiff's back pain "limits him from doing anything." (Doc. 10, pp. 639, 641, 643, 653, 659, 661, 663, 665, 706).

Finding Dr. Pardue's opinions were inconsistent with substantial evidence in the record, the ALJ considered the proper factors when assessing the weight owed to Dr. Pardue's opinions. The ALJ took great care to summarize Dr. Pardue's treatment notes and medical source statements. (Doc. 10, pp. 15-17). In doing so, the ALJ acknowledged Dr. Pardue was a physician at Affiliated Internists and identified the length of the treatment relationship relevant to this claim. (Doc. 10, pp. 15-17). Noting that one of the medical source statements was submitted in 2014, the ALJ pointed out that the record did not contain any treatment records from Dr. Pardue after May 2013. (Doc. 10, p. 17). The ALJ recognized that the Plaintiff generally presented to Dr. Pardue on a monthly basis, and the nature of the treatment relationship was established through the various diagnoses, testing, and treatments. As previously discussed, the ALJ found Dr. Pardue's opinions were not consistent with treatment notes and a cardiopulmonary test. These are good reasons for giving Dr. Pardue's opinions little weight.

Citing *Blakley v. Commissioner of Social Security*, 581 F.3d 399 (6th Cir. 2009), the Plaintiff faults the ALJ for giving great weight to the state examiners' opinions because they

15

were provided without a review of the full record and because their conclusions differ from the medical evidence submitted by the Plaintiff's regular providers. (Doc. 15, pp. 11-13).

This argument is unpersuasive. *Blakley* stands for the position that an ALJ errs where she adopts the findings of state agency physicians who have not examined the full record ***and*** the reviewing court cannot tell whether the ALJ considered the full record. *Blakley*, 581 F.3d at 409. In *Blakley* the ALJ adopted the state agency opinions, but the ALJ's decision did not indicate she properly considered treating physicians' opinions which were proffered after the state agency opinions. *Id.* at 407-09. Because the court could not meaningfully review the ALJ's decision, reversal and remand was required. *Id.* at 409-10.

This application of *Blakley* was confirmed in *Kepke v. Commissioner of Social Security*, 636 F. App'x 625 (6th Cir. 2016). In response to an argument that the ALJ erred by accepting state examiner opinions who had not reviewed the entire medical record, the *Kepke* court stated:

> Kepke misconstrues the Court's holding in *Blakley v. Commissioner of Social Security* as providing a blanket prohibition on an ALJ's adoption of a non-examining source opinion, where that source has not reviewed the entire record. 581 F.3d 399, 409 (6th Cir. 2009). The Court's holding in *Blakley* is far more limited, requiring only that before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give "some indication" that he "at least considered" that the source did not review the entire record. *Id.* In other words, the record must give some indication that the ALJ subjected such an opinion to scrutiny.

*Kepke*, 636 F. App'x at 632.

Unlike the error in *Blakley*, the ALJ in the instant case discussed Dr. Pardue's opinions and provided good reasons for rejecting the opinions. The ALJ additionally provided a thorough summary of the medical records pre-dating and post-dating the state agency providers' opinions. Thus, the ALJ's reliance on the state agency examiners' opinions does not run afoul of *Blakley*.

As to the Plaintiff's claim that the state agency examiners' opinions conflicted with treating source opinions, the treating provider rule no longer applies once the ALJ has properly

16

discredited the treating provider's opinion. *Kepke*, 636 F. App'x at 633 (citing *Price v. Comm'r Soc. Sec. Admin.*, 342 F. App'x 172, 177 (6th Cir. 2009)).

The ALJ provided good reasons for giving Dr. Pardue's opinions little weight, and the ALJ's decision is supported by substantial evidence. The treating physician rule was not violated.

**B. Credibility Assessment**

Though the ALJ found the Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged, the ALJ found the Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (Doc. 10, p. 15). The Plaintiff contends the ALJ erred in discounting the Plaintiff's credibility. (Doc. 15, pp. 14-17).

Upon establishing that medical signs or laboratory findings show medically determinable impairments that could reasonably be expected to produce the symptoms alleged, the ALJ evaluates the intensity and persistence of these symptoms using objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c). Factors pertinent to this assessment include the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the effectiveness of medication or other treatment; other measures to relieve the symptoms; and any other relevant factors. *Id.* § 404.1529(c)(3); *see also* SSR 96-7p, 1996 WL 374186, at *2-3 (S.S.A. July 2, 1996).[4] The ALJ is charged with evaluating the credibility of witnesses, including the claimant. *Rogers*, 486 F.3d

---

[4] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p. *See* SSR 16-3p, 2016 WL 1119029 (S.S.A. Mar. 16, 2016); SSR 16-3p, 2016 WL 1237954 (S.S.A. Mar. 24, 2016) (amending the effective date of SSR 16-3p). As the ALJ's findings and conclusions were made prior to March 28, 2016, the Court applies SSR 96-7p. *See Cameron v. Colvin*, No. 1:15-CV-169, 2016 WL 4094884, at *2 (E.D. Tenn. Aug. 2, 2016) (explaining that SSR 16-3p is not applied retroactively).

at 247 (citations omitted). The reviewing court accords "great deference" to the ALJ's credibility decisions. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) (citation omitted).

Substantial evidence supports the ALJ's credibility evaluation. The ALJ considered the Plaintiff's activities of daily living and found they were consistent with the RFC determination. (Doc. 10, p. 18). These activities included "taking care of personal needs, preparing simple meals, folding laundry, dusting, watching television, listening to the radio, playing solitaire on a laptop computer, and loading/unloading the dishwasher ." (Doc. 10, p. 18). Turning to the treatment received, the ALJ found it was "essentially routine and/or conservative in nature." (Doc. 10, p. 18). Whereas the Plaintiff underwent several surgeries in the past, the treatment received during the relevant time period was limited to pain relief medication and injections. The ALJ noted that medication was relatively effective in controlling the symptoms alleged. This finds support in Dr. Pardue's treatment notes, in which the Plaintiff reported that medications effectively controlled his pain, produced no side effects, and permitted him to function better and perform activities of daily living. (Doc. 10, pp. 639, 641, 643, 653, 659, 661, 663, 665). Contrary to the Plaintiff's description of symptoms and limitations, the ALJ found that the treatment notes from the pain management provider and MRI results did not support the severity of the complaints. (Doc. 10, p. 18). The ALJ further discounted the Plaintiff's assertion that he needs a cane to ambulate because no cane was prescribed and treatment records regularly reported a normal gait and station. (Doc. 10, p. 18). Finally, the ALJ noted that the Plaintiff's "generally unpersuasive appearance and demeanor while testifying at the hearing" was "[a]nother factor influencing the" ALJ's decision. (Doc. 10, p. 18).

The Plaintiff presents four challenges to the ALJ's credibility evaluation. None are persuasive. First, the Plaintiff takes issue with the ALJ's statement that "[u]rine drug screenings .

. . were positive for Butalbutal [sic], Nordiazepam, Oxazepam, Temazepam, Fentanyl, and Norfentanyl, which were not prescribed." (Doc. 10, p. 17) (Doc. 15, p. 14). The Plaintiff states "[i]t is true that urine drug screens during that time period detected 'inconsistent' results, however, each report contains comments which explain that the inconsistencies actually represent metabolites of the claimant's prescribed medication and are entirely consistent with the use of those medications. . . . The ALJ's reference to these test results was presented out of context therefore no adverse conclusions should be drawn with respect to the claimant's credibility." (Doc. 15, pp. 14-15). Having reviewed these records, the undersigned finds the ALJ's statement was accurate. While the reports contain comments explaining inconsistencies in the test results, the explanatory remarks address other drugs. (Doc. 10, pp. 717-718, 727-728, 737-738, 746-747, 756-757). The record supports the ALJ's statement that drug screenings found the presence of drugs that were not prescribed.

The Plaintiff next challenges the ALJ's reliance on the cardiopulmonary exercise test results, claiming the ALJ is playing doctor. (Doc. 15, p. 15). This claim is without merit. The ALJ was required to consider the medical record as a whole in evaluating the Plaintiff's symptoms. 20 C.F.R. § 404.1529(a). This necessarily included the findings made in relation to the cardiopulmonary exercise test.

Third, the Plaintiff faults the ALJ for describing the Plaintiff's treatment as "essentially routine and/or conservative in nature." (Doc. 15, p. 15). This was not a misstatement. While the record is significant for surgical intervention, the Plaintiff's treatment regime consisted of medication and pain relief injections during the relevant time period. The Plaintiff's physicians did not prescribe a cane or other ambulatory assistive device. Nor did the Plaintiff's physicians suggest more aggressive treatment options.

Last, the Plaintiff contends the ALJ's credibility analysis was improperly based on "the claimant's generally unpersuasive appearance and demeanor while testifying at the hearing." (Doc. 15, p. 16). Social Security Ruling 96-7p specifically permits an ALJ to consider his or her personal observations of the claimant as a factor in the overall credibility determination. SSR 96-7p, 1996 WL 374186, at *8. The ALJ's observations of the Plaintiff during the administrative hearings were therefore appropriate considerations in evaluating credibility.

The ALJ provided adequate support for the credibility evaluation, and the claims of error raised by the Plaintiff have no merit. For these reasons, the ALJ's credibility decision should not be disturbed.

## V.     RECOMMENDATION

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that the Plaintiff's motion for judgment on the administrative record (Doc. 14) be **DENIED** and the Commissioner's decision be **AFFIRMED**.

The parties have fourteen (14) days after being served with a copy of this Report and Recommendation ("R&R") to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 155 (1985).

**ENTERED** this 30th day of January, 2017.

/s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge